PHILLIP A. TALBERT
United States Attorney
JASON HITT
ROSS PEARSON
DAVID SPENCER
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>RONALD YANDELL,<br>DANNY TROXELL, and<br>BILLY SYLVESTER<br><br>　　　　　　　Defendants. | CASE NO. 2:19-CR-00107-KJM<br><br>UNITED STATES' MOTION *IN LIMINE* TO PRECLUDE INTRODUCTION OF HEARSAY STATEMENTS BY GARY LITTRELL<br><br>DATE: April 1, 2024<br>TIME: 12:30 p.m.<br>COURT: Hon. Kimberly J. Mueller |

### I.　　INTRODUCTION

The United States moves for the Court to preclude defendant Ronald Yandell from introducing hearsay statements made by Gary Littrell about his role in the murder of Hugo Pinell. These statements are hearsay and no exception applies. Notably, because Littrell made these statements to CDCR officials after they assured him that the information he provided would not be used to incriminate him, these statements were not against his penal interest because they did not tend to subject Littrell to criminal liability. Fed. R. Evid. 804(b)(3). In addition, because Littrell made these statements in order to seek favor from authorities—in the form of dropping out of the Aryan Brotherhood and moving to a new prison—it was actually in his interest, and not against it, to admit to criminal conduct in order to appear to be sincere in his desires to leave the AB, especially where he had been promised that his

admissions would not be used against him. Under these circumstances, courts routinely exclude such statements as improper hearsay, the United States asks this Court to follow this well-established precedent.

In the event that the Court does allow Yandell to introduce statements Littrell made in his debrief, the United States should also be able to introduce statements from his debrief in which he admitted his extensive participation in the AB; revealed that he, Yandell, Sylvester, and Troxell worked together to operate the AB; provided details about the AB activities that Yandell, Sylvester, and himself were involved in; and inculpated Yandell and Sylvester in their roles in the murder of Pinell. If the Court rules that Littrell's statements about the murder of Pinell are against his penal interest, so too are these additional statements admitting to his extensive participation in a RICO enterprise. In addition, these additional statements show that Yandell and Sylvester also worked with Littrell to order Pinell killed, and they are therefore needed to provide context to Littrell's statements about Pinell's murder and rebut Yandell's repeated claims that Littrell alone ordered Pinell's murder.

## II.   FACTS

### A.   The CDCR debriefing process

Under California regulations, when an inmate in the California Department of Corrections and Rehabilitation requests to debrief, the inmate must first complete an interview with CDCR officials. Cal. Code Regs. tit. 15, § 3378.5(a). Before the inmate provides any incriminating information to CDCR officials, the inmate must first complete an "autobiography": a document in which the inmate is provided with a list of all the jails and prisons where he has been incarcerated and instructed to document his own personal gang activity and his knowledge of other gang activities at every county jail and prison at which the inmate was housed. Ex. A, Sample Autobiography Instructions at 1.

The first page of the autobiography makes clear to the inmate that the information he is providing will not be used as incriminating evidence against the inmate himself. Ex. A, Sample Autobiography Instructions at 1. It states that the information the inmate provides is for "intelligence gathering and administrative purposes" only and "not for the purposes of acquiring incriminating evidence against [the inmate]." Ex. A, Sample Autobiography Instructions at 1.

State regulations governing the debriefing process echo the disclaimer in the autobiography that

the information the inmate provides in the debrief process is "not for the purpose of acquiring incriminating evidence against the subject" but rather to learn enough about the inmate to conclude that he has dropped out of his gang and that he can be safely reclassified to a different prison or prison yard. Cal. Code Regs. tit. 15, § 3378.5(b).

After the inmate completes his autobiography, a CDCR official interviews the inmate and asks further questions about the inmate's own crimes and about crimes the inmate knows about.  As with the autobiography, state regulations require the debrief interview to be conducted in a manner under which the information the inmate provides will not be used to acquire incriminating evidence against the inmate.  Specifically, state regulations provide that the inmate is not required to waive his "right against self-incrimination" in order to undergo the debrief process "since the information is provided for administrative purposes" and not for use in a criminal prosecution.  Cal. Code Regs. tit. 15, § 3378.5(e). Inmates are not *Mirandized* at the start of the debriefing process.  *See, e.g.*, Def. Ex. RY-82 at 1–5 (beginning of debriefing of Travis Burhop in which Burhop was not *Mirandized* prior to custodial interrogation).  And if the investigator conducting the debrief interview later wants to question the inmate about an incriminating matter, state regulations require the investigator to *Mirandize* the inmate and require the inmate to "waive the right against self-incrimination" before any such questioning.  Cal. Code Regs. tit. 15, § 3378.5(e).  As a result, the debriefing interview is conducted in a manner in which the inmate will not incriminate himself in a way in which the statement can be used against him, unless he is first given *Miranda* warnings.

If an inmate wants to drop out of a prison gang, he must complete the debriefing process.  Cal. Code Regs. tit. 15, § 3378.5 ("Debriefing is the process by which a STG [security threat gang] coordinator/investigator determines whether an offender (subject) has dropped out of a STG.").  As such, before an inmate is allowed to be moved to a different prison, he must complete his autobiography and interview with CDCR officials so that officials can determine that his desire to move is sincere.  Cal. Code Regs. tit. 15, § 3378.5(b).

### B. Gary Littrell's debrief

In late 2016, former Aryan Brotherhood member Gary Littrell met with CDCR officials for a debriefing interview. *See generally*, Ex. B, Littrell Debrief (under seal). In a lengthy, and wide-ranging interview,[1] Littrell discussed his own involvement in the Aryan Brotherhood and the involvement of others, including Yandell, Sylvester, and Troxell. Littrell discussed his involvement in the Aryan Brotherhood RICO case in the early 2000s and explained that as a result of the RICO case, the California Aryan Brotherhood placed Troxell on the AB council. Ex. B, Littrell Debrief at 62 (under seal). Littrell described Troxell as "legendary" based on his length of time as a member and his accomplishments on behalf of the AB. Ex. B, Littrell Debrief at 100 (under seal). Littrell discussed a rift among AB members at Pelican Bay in the late 2000s that stemmed from Troxell's attempts to reconfigure the authority of the AB and the subsequent *Ashker* litigation. Ex. B, Littrell Debrief at 69 (under seal).

Littrell met Sylvester in 2013 when CDCR officials moved Littrell to CSP-Sacramento. Ex. B, Littrell Debrief at 71 (under seal). Littrell knew that, a few years earlier, Sylvester had murdered Ronald Richardson on the exercise yard at CSP-Sacramento SHU because the AB had targeted Richardson for murder, and Littrell used this murder as a merit towards Sylvester gaining membership in the AB. Ex. B, Littrell Debrief at 112 (under seal). When Littrell arrived at CSP-Sacramento, he told Sylvester that he was on his AB probationary period. Ex. B, Littrell Debrief at 71 (under seal). Littrell started using Sylvester to disseminate his orders, which, he explained, allowed Littrell to place a layer between himself and the AB-affiliated inmates, and to monitor Sylvester's ability to handle AB political and criminal activity. Ex. B, Littrell Debrief at 71 (under seal). Over the next two years, Littrell and Sylvester continued to work together to carry out AB orders at CSP-Sacramento, including targeting inmates for murder, ordering stabbings, and collecting money. Ex. B, Littrell Debrief at 73–76 (under seal). Eventually, Littrell explained, Sylvester orchestrated all criminal activity on behalf of the AB at CSP-Sacramento. Ex. B, Littrell Debrief at 103 (under seal).

---

[1] Years ago, in response to a subpoena, CDCR produced to the United States a redacted version of Littrell's debriefing interview. The vast majority of this 145-page debriefing report is redacted. As such, this factual recitation is only taken from portions of the debriefing report that have not been redacted.

Littrell also claimed that he played a crucial role in relaying the AB's orders to murder Hugo Pinell. Ex. B, Littrell Debrief at 76–77 (under seal). Litrell stated that had previously shared a cell with Yandell in the SHU at CSP-Sacramento, but Litrell was later released to the general population yard on Facility B. Ex. B, Littrell Debrief at 103 (under seal). Before Pinell's murder, Littrell had a phone call with five AB members, including Yandell and Sylvester. Ex. B, Littrell Debrief at 77 (under seal). On the call with Yandell, Sylvester, and the other AB members, one of the AB members told Littrell that the AB wanted Pinell killed as soon as possible, and they assigned Littrell the task of orchestrating Pinell's murder. Ex. B, Littrell Debrief at 77 (under seal).

Littrell claims that he first approached black inmates and gave them an opportunity to assault Pinell, but they declined to do so. Ex. B, Littrell Debrief at 77 (under seal). According to Littrell, when the black inmates declined to attack Pinell, Littrell chose Waylon Pitchford and Jayson Weaver to kill Pinell, and he told Weaver that Pinell had Weaver's "rock in his pocket," indicating that Weaver would be made an AB member for killing Pinell. Ex. B, Littrell Debrief at 78 (under seal). Littrell described how he helped plan out Pinell's murder, and how the murder unfolded. Ex. B, Littrell Debrief at 78–79 (under seal). About a week after Weaver and Pitchford murdered Pinell, Littrell had another call with Yandell, Sylvester, and two other AB members, and they congratulated Littrell on successfully accomplishing the murder. Ex. B, Littrell Debrief at 79 (under seal). Yandell and Littrell and another AB member later sponsored both Weaver and Pitchford for AB membership due to their participation in the murder of Pinell. Ex. B, Littrell Debrief at 103, 108 (under seal).

A few years after he spoke with CDCR officials, Littrell passed away and as such he will not testify at trial. Nonetheless, Yandell has repeatedly sought to introduce his hearsay to the jury through argument, cross-examination of various witnesses and, it appears, by calling several CDCR officials in his case-in-chief who took part in Littrell's debriefing process.

### III. DISCUSSION

#### A. The statements Littrell made in his debrief are hearsay.

As a starting point, Littrell's statements made in his debrief are hearsay. They are out-of-court statements that Littrell made about his role in Pinell's murder that Yandell now seeks to introduce for the truth of the matter asserted. Fed. R. Evid. 801(c). As such, under the rules of evidence, the default

is that this hearsay is inadmissible. Fed. R. Evid. 802.

### B. No hearsay exception applies to Littrell's statements, and as such these statements are inadmissible.

Yandell has not proffered any theory of admissibility for these statements, and no hearsay exception applies. These statements are simply inadmissible, out-of-court statements.

Notably, Littrell's statements do not fall under the hearsay exception for statements against penal interest. Rule 804(b)(3) provides an exception to the rule against hearsay for statements against penal interest made by a declarant who is unavailable, which Littrell undisputedly is. Fed. R. Evid. 804(b)(3). For a statement to be admissible under Rule 804(b)(3), the proponent must show that it is a statement "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made," the statement would "expose the declarant to . . . criminal liability." Fed. R. Evid. 804(b)(3)(A). The proponent must also show that there the statement is "supported by corroborating circumstances that clearly indicate its trustworthiness," and that it "tends to expose the declarant to criminal liability." Fed. R. Evid. 804(b)(3)(B). Put differently, the statement must "(1) solidly inculpate the declarant and (2) be one that a reasonable person in the declarant's position would not have made unless it were true." *United States v. Magana-Olvera*, 917 F.2d 401, 407 (9th Cir. 1990). To determine whether a reasonable person in the declarant's position would have only made the statements if true, courts consider the circumstances under which the declarant spoke. *Id.*

Littrell's statements do not fall under Rule 804(b)(3) for two reasons. First, Littrell's statements did not "tend to expose [him] to criminal liability," because Littrell was assured that the statements he made in the debriefing process would not be used to incriminate him. Fed. R. Evid. 804(b)(3)(A). For this prong, courts routinely hold that a statement cannot qualify as a statement against penal interest when the declarant has been assured that the statement will not be used against him in a criminal proceeding. *See, e.g.*, *United States v. Gonzalez*, 559 F.2d 1271, 1273 (5th Cir. 1977). In *Gonzalez*, for instance, the Fifth Circuit noted that the testimony of a witness who had been given immunity could not qualify as a statement against penal interest, because the statement "could not subject him to criminal liability." *Id. Accord. United States v. Keltner*, 147 F.3d 662, 672 (8th Cir. 1998) (holding that statement "was not admissible as a statement against penal interest because the government had granted

UNITED STATES' MOTION *IN LIMINE* TO PRECLUDE
INTRODUCTION OF HEARSAY STATEMENTS BY GARY
LITTRELL

6

1  immunity" to the declarant), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36
2  (2004); *United States v. Jackson*, 454 F. App'x 435, 447 (6th Cir. 2011) (finding that a statement was
3  not against penal interest where the declarant "offered the proffer as part of seeking a plea agreement
4  with the prosecution, and all parties agree that, under the operative *Kastigar* letter, the co-defendant
5  knew that his statements could not be used directly in any prosecution against him, as long as he told the
6  truth"); *United States v. Rodriguez*, No. CRIM. 08-0242CCC, 2011 WL 2377583, at *2 (D.P.R. May 9,
7  2011) ("When they gave their interview statements to law enforcement officers, the speakers were not
8  concerned that the statements they made could be used against them since they were expressly shielded
9  by the direct use immunity provided in their proffer letters . . . .").

10  Under this well-established principle that an immunized statement is not against penal interest,
11  Littrell's statements to CDCR officials were not against his penal interest because he too received
12  assurances—akin to promises of immunity—that the statements he gave would not be used to
13  incriminate him.  Before Littrell made any incriminating statements, he completed an autobiography in
14  which he was (1) instructed to incriminate himself by discussing all of his own gang activity and (2)
15  plainly advised him that "any and all information" he provided was for "intelligence gathering and
16  administrative purposes" only and "not for the purposes of acquiring incriminating evidence" against
17  him.  Ex. A, Sample Autobiography Instructions at 1.  Under these circumstances, any reasonable person
18  in Littrell's position would have believed exactly what he was told:  that he would face no criminal
19  consequences from the information he provided to CDCR officials.  His subsequent statements
20  incriminating himself while also extensively implicating others in crimes therefore cannot be considered
21  statements against penal interest because the statements "could not subject him to criminal liability."
22  *Gonzalez*, 559 F.2d at 1273.

23  Second, because Littrell had to provide information about himself and his fellow AB members in
24  order to disassociate from the AB and get moved to a different prison, the statements he made
25  incriminating himself and others were, in fact, in his best interest and not against it. As the advisory
26  committee notes to Rule 804 recognize, "[A] statement admitting guilt and implicating another, made
27  while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to
28  qualify as against interest." Fed. R. Evid. 804(b)(3) advisory committee notes.  And courts often find

UNITED STATES' MOTION *IN LIMINE* TO PRECLUDE
INTRODUCTION OF HEARSAY STATEMENTS BY GARY
LITTRELL

7

that statements are not against penal interest when the declarant makes the statements in circumstances in which he has an incentive to incriminate himself and others in order to get a "deal" from authorities. *Magana-Olvera*, 917 F.2d at 408–09 (collecting cases). This principle applies with even stronger force where the declarant is trying to get a deal from authorities *and* he has been promised that his statements will not be used against him, because in these circumstances, making an incriminating statement that also implicates others would appear "to be in [the declarant's] best interest, rather than against it." *Gonzalez*, 559 F.2d at 1273.

Just like the statement given by an immunized defendant seeking to curry favor with authorities, the statement Littrell gave to CDCR officials in order to leave the AB and get moved to a different yard was, in fact, in his best interest and not against his penal interest. Littrell was advised that he had to undergo the debriefing process to disassociate from the AB and be moved to a different prison, and as part of that process he had to fully describe all of his own crimes and his knowledge of the crimes of his fellow AB members. Ex. A, Sample Autobiography Instructions at 1. The autobiography instructions also told Littrell that the goal of having him complete the autobiography was "to accurately conclude [his] request to debrief [was] sincere." Ex. A, Sample Autobiography Instructions at 1. Undergoing this process was the only way Littrell could leave the AB and get moved to a different prison yard. Cal. Code Regs. tit. 15, § 3378.5(b).

In other words, Littrell was told to be thorough in his debriefing, that his information would be evaluated to determine if his request to leave the AB was sincere, that providing this information was the only way he could leave the AB and get moved to a new yard, and that any information he provided would not be used to incriminate him. Under these circumstances, it was entirely in Littrell's interest to extensively discuss crimes he had committed, implicate other AB members, and claim credit for AB stabbings, murders, and drug deals, whether or not he actually ordered the stabbings or murders. Indeed, there was no downside to Littrell for claiming credit for a wide variety of AB crimes, because he knew he would not be prosecuted for these crimes and admitting to them would only make his claim that he had disassociated from the AB seem more sincere. Under these circumstances, a reasonable person in Littrell's position would have seen that it was in his interest to incriminate himself, and not against his interest. This statement was not a statement against penal interest. *Gonzalez*, 559 F.2d at 1273.

**C.     If the Court allows Yandell to introduce Littrell's statements, it should also allow the United States to introduce the entire context of Littrell's statements—including the several inculpatory statements about Yandell, Sylvester, and Troxell.**

If the Court does allow Yandell to introduce Littrell's statements, the United States must be allowed to introduce the full context of what Littrell told CDCR officials, including that Littrell made incriminating statements about Yandell, Sylvester, and Troxell, and that Yandell and Sylvester were both involved in the plot to murder Pinell.

First, if Littrell's statements about his role in the murder of Pinell are statements against penal interest, so, too, are his statements in which he admitted to actively participating in the Aryan Brotherhood criminal enterprise, because these statements tended to expose him to criminal RICO liability. Indeed, a reasonable person in Littrell's position would be especially aware that admitting to participating in the AB would tend to incriminate him, because he had previously been prosecuted federally under RICO for participating in the AB.

Thus, any statements Littrell made about his participation in the AB and his knowledge of members and features of the enterprise were against his penal interest and the United States should also be allowed to introduce these statements. This list of statements would include[2] the following: (1) Littrell and Sylvester were working together at CSP-Sacramento to order murders and stabbings, and collecting drug debts; (2) Littrell sponsored Sylvester for AB membership because Sylvester had murdered an inmate named "Rock Steady," who had been targeted by the AB for murder; (3) Sylvester was running all criminal activity in CSP-Sacramento; (4) Troxell was a legendary AB member who was on the AB council and Littrell participated in discussions with Troxell about the AB in Pelican Bay; (5) Yandell and Sylvester and other AB members called Littrell before the Pinell murder and an AB member on the call told Littrell to orchestrate Pinell's murder; (6) Yandell and Sylvester and the other AB members called Littrell after the murder and congratulated him for successfully murdering Pinell; and (7) Yandell and Littrell sponsored Jayson Weaver and Waylon Pitchford for membership in the AB because both Weaver and Pitchford murdered Pinell.

---

[2] This list is not intended to be exhaustive. Indeed, the United States understands that Yandell has sought to obtain Littrell's written autobiography, and that there may be additional statements in the handwritten autobiography that the United States would seek to elicit.

Second, the Court undoubtedly has discretion under Rule 611 to allow the United States to introduce these additional statements in Littrell's debrief to provide full context of his statements to CDCR officials. Fed. R. Evid. 611(a) ("The court should exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . make those procedures effective for determining the truth . . . ."). In applying this rule, courts should "exercise common sense and a sense of fairness" and "require[ ] a party offering testimony as to an [oral] utterance to present fairly the 'substance or effect' and context of the statement" such that "the testimony ... 'at least represent[s] the tenor of the utterance as a whole, and not mere fragments of it.'" *United States v. Castro,* 813 F.2d 571, 576 (2d Cir. 1987) (quoting 7 J. Wigmore, *Evidence* § 2099 (Chadbourn rev. 1978)).

Here, to provide the full "context of the statement" by Littrell, the United States must be able to introduce the extent of his participation in the AB and his extensive communications with Yandell and Sylvester before and after Pinell's murder. It is particularly important that the Court allow the United States to present this additional evidence, because Yandell has repeatedly argued and suggested a during trial that Yandell cannot have ordered Pinell's murder because Littrell ordered it. This is a false choice. The full context of Littrell's debrief shows that Pinell's murder was a group effort—and that Yandell, Sylvester, and Littrell were all part of the group that worked together to order, orchestrate, and carry out the murder. The fact that Littrell admitted in his debrief to knowing and working with Yandell and Sylvester for years prior to the murder further underscores that it was not one or the other—Yandell or Litrell—who ordered Pinell's murder. It was both. Allowing the jury to hear only that Littrell admitted to ordering the murder—without the broader context of Littrell's extensive role and history in the AB— would therefore allow Yandell to distort the factfinding process.

Finally, if the Court does allow Yandell to introduce Littrell's statement, the United States will have the right under Rule 806 to attack Littrell's credibility, bias, and motive to lie. Fed. R. Evid. 806.

## IV. CONCLUSION

The United States asks this Court to preclude the defendants from introducing the hearsay statement of Gary Littrell, or, alternatively, to allow the United States to introduce extensive portions of his statement, as discussed above, in order to present the full context of Littrell's debrief.

Dated: March 29, 2024

PHILLIP A. TALBERT
United States Attorney

By: /s/ ROSS PEARSON
JASON HITT
ROSS PEARSON
DAVID SPENCER
Assistant United States Attorneys