UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:19-cr-00107-KJM |
| Plaintiff, | ORDER |
| v. | |
| Ronald Yandell, | |
| Defendant. | |

The government moved *in limine* to prevent the defense from introducing out-of-court statements by a deceased non-party, Gary Littrell, during the jury trial in this case. *See generally* Mot., ECF No. 2093. Defendant Ronald Yandell opposed that motion, contending Littrell's statements were admissible because he is unavailable and making the statements was against Littrell's interest under Federal Rule of Evidence 804(b)(3). *See generally* Opp'n, ECF No. 2098. Alternatively, Yandell relied on the residual hearsay exception in Rule 807. After the government replied, *see generally* Reply, ECF No. 2123, the court granted the motion to exclude the statements from the bench with a written explanation to follow, *see* Mins., ECF No. 2128.

As explained in this order, although Littrell's out-of-court statements implicate him in potential crimes, a reasonable person in his situation would not have thought he would actually face civil or criminal liability for saying what he said when he said it. It was not against his

1

1  interest to make the statements, but rather in his best interest to do so. For that reason, Littrell's
2  statements do not satisfy the requirements of Rule 804(b)(3) and are not admissible. Nor can
3  Yandell rely on the residual exception in Rule 807. That rule requires pretrial notice. Yandell did
4  not give notice, and he did not show he should be excused from giving notice.

## I.   BACKGROUND

The government charged Yandell and several codefendants with violations of the Racketeer Influenced and Corrupt Organizations (RICO) Act and the Controlled Substances Act. It alleged Yandell was among the leadership of the Aryan Brotherhood, a white prison gang. Among other charges about drug trafficking and violence within California prisons, the government alleged Yandell committed murder in aid of racketeering. *See* Superseding Indictment at 18–19, ECF No. 1375. The victim of the alleged murder was Hugo Pinell, an inmate who, according to the California Department of Corrections and Rehabilitation (CDCR), was a long-time member of a different prison gang made up of Black inmates. *See, e.g.*, Compl. at 33–36, ECF No. 1 (summarizing government's allegations). The government does not allege Yandell personally murdered Pinell, but rather that he and others within the Aryan Brotherhood orchestrated Pinell's death. *See, e.g.*, Superseding Indictment at 18–19; Compl. at 35–36. In his defense, Yandell contends the CDCR created the conditions that allowed Littrell to orchestrate Pinell's death at the hands of two other men who are not defendants in this case. *See, e.g.*, Resp. Gov't Mot. re Third Party Liability at 3, ECF No. 1950. Yandell would have relied on Littrell's statements to support that theory of the case.

Yandell cites five documents containing what he describes as evidence Littrell "repeatedly confessed to law enforcement officers that he ordered the Pinell homicide." Opp'n at 3. The first is a September 2015 report. *See* Ex. 1 at 1. It describes a CDCR interview of Littrell in California State Prison, Sacramento, a few weeks after Pinell's death. *See id.* According to the report, CDCR had "validated" Littrell as a full member of the Aryan Brotherhood since the late 1980s, and it believed he was "very well known among his peers and subservient White inmates." *Id.* The report also notes Littrell's "dedication, loyalty and participation in criminal and felonious activities for the betterment of the [Aryan Brotherhood]," which had led federal authorities to

2

indict him—alongside several other Aryan Brotherhood members and associates—for violations of the federal RICO statute years before. *Id.*; *see also, e.g.*, *United States v. Littrell*, 478 F. Supp. 2d 1179, 1180–85 (C.D. Cal. 2007) (summarizing previous federal prosecution and charges against Littrell).

After the officer told Littrell he wanted to discuss "the riot incident" in which Pinell died, Littrell "quickly responded" by volunteering several statements. First, he said Pinell was on the Aryan Brotherhood's "enemy list and should not have been put out on that yard." Ex. 1 at 1. This statement referred to the CDCR's decision to transfer Pinell from a more secure housing unit into the general population a few months before. *See id.* Second, Littrell described Pinell as "disrespectful" to multiple prison gangs and to CDCR officers and as disliked by "his own people." *Id.* Third, Littrell said his own housing conditions would have been better—that is, Littrell would not have been transferred to a higher-security housing unit within the prison after Pinell's murder—if Pinell's "own people" had "taken care of him." *Id.* And finally, Littrell said he thought the situation would "work itself out" as "it always does," especially when "the other guys," prominent gang members, that is, eventually came down from another prison to "talk it out." *Id.* Beyond this, however, Littrell "refused to engage." *Id.* The remainder of the report discusses relationships between prison gangs and whether Littrell or other white inmates were at risk of "retaliation incidents." *Id.* at 2.

The second document is another CDCR report, this one dated June 2016, almost a year after the first. *See* Ex. 2 at 1. It details an interview in a different prison, Kern Valley State Prison. *See id.* According to that report, after he was transferred to Kern Valley, Littrell had come to CDCR officers with concerns about his safety: "he did not want to participate or engage in any Aryan Brotherhood politics" any longer and was "requesting Sensitive Needs Yard (SNY) placement." *Id.* A week later, staff gave him a "Debrief Autobiography instruction." *Id.* These terms—"debrief" and "autobiography"—refer to a formal administrative process within the California prison system. In that process, correctional investigators determine whether inmates have "dropped out" of a prison gang. *See* Cal. Code Regs. tit. 15, § 3378.5 (Nov. 1, 2023). The process includes an "interview phase" intended to obtain an "autobiography" of the person's

3

involvement with the gang and information about the gang's "structure, activities, and affiliates." *Id.* § 3378.5(b).

Reports of the debriefing process are "confidential" by definition. *See id.* § 3321(a)(5). In addition, prison officials must not make decisions based on these reports (as is true of other confidential sources) "unless other documentation corroborates information from the source, or unless other circumstantial evidence and the documented reliability of the sources satisfies the decision maker(s) that the information is true." *Id.* § 3321(b)(1). Regulations list several "criteria" to establish whether confidential information is reliable. One criterion is that the information is self-incriminating. *Id.* § 3321(c)(3). Although information might be considered more reliable if it tends to incriminate the person who offered it, regulations forbid investigators from using the debriefing process specifically to obtain evidence they could use against the inmate. *Id.* § 3375.5(b). Investigators do not give warnings under *Miranda v. Arizona*, 384 U.S. 436 (1966), and "a waiver of the right against self-incrimination is not a precondition" of the debrief process, Cal. Code Regs. tit. 15, § 3378.5(e). If an inmate makes a self-incriminating statement, the investigator "may stop any discussion about the matter and continue on with another topic," but before asking any questions "about the incriminating matter, the subject must waive the right against self-incrimination." *Id.* The inmate's decision to exercise the right against self-incrimination "shall not affect the determination of whether [that inmate] successfully participated in the debrief process." *Id.* Inmates also are "free to terminate the debrief process at any time." *Id.*

According to the June 2016 CDCR report, Littrell completed an "autobiography" in April 2016. Ex. 2 at 1. CDCR investigators reviewed it and asked him for a "more in-depth autobiography." *Id.* Littrell "indicated" in response "he didn't want to provide any more information until he talked to his Attorney." *Id.* But he did explain more about Pinell's death. *See id.* at 1–3. According to the report, Littrell told the interviewer Pinell had been disrespectful to the wife of an Aryan Brotherhood member during her visit. *See id.* at 2. Littrell asked a "shot caller" among the Black inmates to "handle" Pinell. *Id.* The CDCR officer understood this to mean that Littrell was asking the leadership of a Black prison gang to assault Pinell and remove

4

him from the facility. *See id.* The "shot caller" refused Littrell's request, and so, according to the report, Littrell began planning Pinell's murder: "I ordered the hit of Pinell." *Id.* He told two other men "to get him and don't stop till he is dead." *Id.* at 3.

The third and fourth documents Yandell cites in his motions are the handwritten "autobiographies" Littrell prepared in response to CDCR's requests. *See generally* Exs. 3, 4. The court has not summarized those handwritten accounts here, as the fifth document, another report prepared several months later in February 2017, was itself prepared as a distillation of that autobiography and contains all the information material to Yandell's current motion. *See* Ex. 5 at 1. Like the first two exhibits, the fifth is a CDCR investigative report, but at 145 pages, it is much longer than the first two, which were only three and five pages long, respectively.

The fifth, 2017 report states that a CDCR investigator conducted more interviews with Littrell over four days in September and October 2016. *Id.* at 1. By that point, about a year had passed since Pinell's death. On the report's second page, it states Littrell "expressed concerns the information provided would be used against him in future prosecution." *Id.* at 2. It appears, however, that investigators assuaged that concern by informing him of CDCR's policy—summarized above—that debriefing sessions are "not for the purpose of acquiring incriminating evidence against the Subject," but instead "to learn enough about the Subject and the Subject's current gang" to (1) "reasonably conclude the Subject has dropped out of the gang," (2) to allow prison staff to protect the person from retaliation, and (3) to reclassify the person for "new custody, housing, and assignment needs." *Id.*

The remainder of the report is broken into several sections: a short profile of Littrell, *id.* at 3; a description of his motivation for leaving the gang, *id.* at 3–4, 81–82; a list of common terms and acronyms related to the Aryan Brotherhood, *id.* at 4–9; a history of Littrell's gang activity over the many years of his incarceration, *id.* at 9–82; lists of other Aryan Brotherhood members and associates, *id.* at 83–87, 99–108; a description of the Aryan Brotherhood's structure, organization, practices, codes, rules, tactics, addresses, weapons, goals, symbols, allies, enemies, murders, and other information, *id.* at 87–116; a list of other "information" about events in CDCR's files, *id.* at 117–27; a list of other inmates with possible safety concerns, *id.* at 130–

5

31; an index, *id.* at 132–43; and a conclusion and statement about why CDCR investigators believed Littrell's statements were sufficiently reliable, *id.* at 143–44.

This final report's lengthy catalog of Littrell's gang activity includes more details about the events surrounding Pinell's death. *See id.* at 76–79. It includes, for example, different claims about Littrell's plan and some statements by Littrell about internal communications within the Aryan Brotherhood. *See id.* at 78. For example, it relates Littrell's account of calls with other influential Aryan Brotherhood members on contraband cell phones that occurred soon before Pinell's death—and then the reactions of these other gang members after Pinell's death. *See id.* at 77, 79. Yandell and his codefendant in this case, William Sylvester, were among the other Aryan Brotherhood members Littrell identified. *See id.* According to the report, Littrell "likened his reception" within the Aryan Brotherhood after Pinell's murder "to a hero's welcome." *Id.* at 79.

The report also analyzes Littrell's statements about his motivations for dropping out of the Aryan Brotherhood, and likewise for speaking to CDCR investigators. *See id.* at 3–4, 81–82. After he was transferred to Kern Valley, Littrell suffered a heart attack and was hospitalized for a week. *Id.* at 80–81. Soon after he returned to the prison from the hospital, he began to suspect he was falling out of favor with the Aryan Brotherhood. *Id.* at 81. He feared the gang had even targeted him for murder. *Id.* A member of another prison gang had contacted his sister to request money, which led him to fear the Aryan Brotherhood had decided not to protect him any longer. *Id.* at 3–4, 82. Without that protection and in failing health, he believed he could not defend himself any longer. *See id.* at 80–81, 82. Littrell later died while still incarcerated. No party has suggested his death was the result of anything but natural causes.

In March 2024, several weeks after the trial in Yandell's case had begun in February, the government moved in limine to preclude him from "introducing hearsay statements made by Gary Littrell about his role in the murder of Hugo Pinell." Mot. at 1. As noted above, the court granted that motion from the bench after receiving full briefing and after hearing oral arguments by the parties outside the presence of the jury. *See* Mins. The trial continued, and a jury reached a unanimous verdict in April. *See* Verdict, ECF No. 2317. It found Yandell guilty of each of the charges against him, including the charge for murdering Pinell in aid of racketeering. The court

1  has not yet sentenced Yandell, and he has filed two dispositive motions, which are pending at the
2  time this order is issuing.  *See* Mot. J. Acquittal or New Trial, ECF No. 2377; Mot. Dismiss
3  Vindictive Prosecution, ECF No. 2277.

## II. DISCUSSION

As noted, the government relies on the rule against hearsay.  "Hearsay" statements are statements made outside the current trial or hearing offered "to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Hearsay is inadmissible unless a statute or rule provides otherwise.  Fed. R. Evid. 802.  Littrell's disputed statements were all made outside of trial, and Yandell would have introduced those statements as proof of what Littrell claimed. Littrell's statements are thus inadmissible unless they fall within an exception to the rule against hearsay.  As summarized above, Littrell's statements are all found within CDCR's records, introducing potentially a second layer of hearsay.  *Cf.* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule.").  As explained below, it is unnecessary to reach that second layer, as Littrell's statements are themselves inadmissible hearsay.

### A. Statements Against Interest

Yandell relies primarily on the hearsay exception in Rule 804(b)(3).  Under that rule, a hearsay statement is admissible if the declarant is unavailable and at least two things are true. First, "a reasonable person in the declarant's position" would have made the statement "only if the person believed it to be true because," among other reasons, when made, the statement "had so great a tendency . . . to expose the declarant to civil or criminal liability."  Fed. R. Evid. 804(b)(3)(A).  Second, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability."  Fed. R. Evid. 804(b)(3)(B).  The parties agree Littrell is unavailable.  *See* Fed. R. Evid. 804(a)(4) ("A declarant is considered to be unavailable as a witness if the declarant . . . cannot be present or testify at the trial or hearing because of death . . . .").  But the government argues "a reasonable person" in Littrell's position would not

have believed the disputed statements would expose him to "civil or criminal liability." *See* Mot. at 6–8. The court agrees.

To begin, some of Littrell's statements were not self-incriminatory. In the first report, for example, prepared in 2015, Littrell did not admit to a role in Pinell's murder. He told the officer Pinell was on a list of Aryan Brotherhood enemies and was disrespectful and broadly disliked, *see* Ex. 1 at 1, he said vaguely that Littrell himself would not have been confined in a more restrictive and secure housing unit if Pinell's "own people" had "taken care of him," *id.*, and he answered the officers' questions about whether future violence was likely, *see id.* at 1–2. These statements certainly implied Littrell's membership in the Aryan Brotherhood, and they betrayed his familiarity with gang politics, but his relationship with the Aryan Brotherhood was not news to CDCR. It had validated him as a member of the Aryan Brotherhood in the 1980s, and he had been indicted in a federal racketeering case against the Aryan Brotherhood in the early 2000s. *See id.* at 1.

Littrell did not make statements about ordering Pinell's death until the summer of 2016— after he had been transferred to Kern Valley, after he was hospitalized for a heart attack, after a member of another gang asked his family for money, and after he came to fear members of the Aryan Brotherhood had targeted him for murder. He went to officers because he wanted protection and wanted to drop out of the gang, which meant he would go through CDCR's debriefing process. Littrell thus had an incentive to curry favor with investigators. The more he could divulge about the gang, the more murders and assaults he could list, and the more people he could implicate as active gang members, the more likely investigators would believe he was renouncing the Aryan Brotherhood, needed protection, and would not cause problems in a protected housing unit where former gang members are housed. If Littrell did not satisfy the investigators, he would remain in a housing unit where he feared assaults and death. Given these unusual circumstances, confessions were in his interest. Federal courts have recognized that incarcerated witnesses have very different incentives than other witnesses who admit to crimes, especially when they are speaking to government agents and others with authority over them. *See, e.g.*, *United States v. Magana-Olvera*, 917 F.2d 401, 408–09 (9th Cir. 1990) (collecting

authority to show federal circuit courts have taken a "dim view of statements made with an eye to obtaining a 'deal' with the government," such as after an arrest in police custody); *United States v. Monaco*, 735 F.2d 1173, 1176–77 (9th Cir. 1984) ("Depending on the circumstances, a purportedly damaging statement may be made with the purpose of placating the authorities or diverting their attention.  In particular, a statement admitting guilt and implicating another, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest." (citation and quotation marks omitted)).

Littrell's circumstances also sharply reduced or eliminated the likelihood he would suffer any negative consequences from making a confession.  As summarized above, CDCR uses the debriefing process to learn about the inmate, substantiate the inmate's claims, confirm the inmate truly intends to drop out of the gang, and understand why.  CDCR regulations do not permit officers to use the debriefing process to obtain incriminating evidence about the debriefing inmate.  The reports of Littrell's debriefing sessions confirm he understood this.  According to the fifth report, he "expressed concerns that the information provided would be used against him in future prosecution." Ex. 5 at 2.  And from context, it appears CDCR investigators persuaded him to continue by explaining the CDCR policy protecting him.  *See id.*  These reassurances suggest a reasonable person in Littrell's shoes would not have thought he risked criminal liability by admitting to murders.  The broader context supports this conclusion as well.  If, in general, inmates feared they could be prosecuted for what they admitted in debriefing sessions, very few would likely agree to debrief.

Similarly, nothing in the CDCR reports or other parts of the record suggest Littrell had a reason to suspect what he told investigators would be publicly disclosed.  CDCR regulations made the report confidential.  Cal. Code Regs. tit. 15, § 3321(a)(5) (Nov. 1, 2023).  It would not have been publicized.  *See id.*  CDCR investigators have a strong incentive to keep reports confidential.  Confidentiality protects the inmates who give investigators information about prison gangs and encourages others to drop out and come forward.  If inmates thought their autobiographies would be publicized, very few would likely come forward.  *See, e.g.*, Ex. 5 at 2.

9

Littrell's admissions were thus unlikely to expose him to liability in any future civil cases, either, such as a wrongful death case by members of Pinell's family.

Yandell argues to the contrary that statements from debriefing interviews have been disclosed publicly and have been employed against inmates in later prosecutions. But he cites no examples. Nor does he cite evidence to show Littrell knew about any such cases when he made his disputed statements.

The debriefing sessions of other inmates Yandell references in his brief do not support his argument. He first cites the case of Jeremy Beasley, a trial witness and former member of the Aryan Brotherhood. *See* Opp'n at 8–9. He argues a parole board relied on information Beasley disclosed during his debriefing interviews when it denied his request for parole. *See id.* But Beasley had already been convicted and sentenced at the time. He was not convicted of a new crime. And contrary to Yandell's argument, it is unclear whether the parole board actually relied on confidential information from the debriefing. *See* Ex. 7 at 112 ("The confidential section of the central file was reviewed . . . . However, it did not weigh in our decision today . . . ."); *id.* at 123 ("So, that's not my concern, all that confidential stuff, you notice, we didn't really spend any time on it. It didn't, it wasn't part of our decision today . . . ."). And contrary to Yandell's argument, Beasley's debriefing report seems to have left a favorable impression on the board. *See, e.g.*, *id.* at 12 ("[That] was one of the better debriefs I've read, you know, and I've read a lot. I used to read a lot as, as the special agent in charge and formerly at the senior, I used to sit in on inactive reviews.").

Yandell also cites debriefing statements by Donald Mazza and Travis Burhop, two of his codefendants. *See* Opp'n at 9. He argues the government used what it learned during their debriefing interviews in their plea agreements. *Id.* As Mazza and Burhop testified at trial, they debriefed after they were charged in this case. That is, they were not charged because of what they said in their debriefing interviews, but rather secured plea agreements on existing charges after their interviews. Confessions and admissions would likely benefit them, such as by helping federal prosecutors secure the convictions of their codefendants and by ensuring Burhop and Mazza would be protected from retaliation for their cooperation with the government. For these

10

reasons, although Littrell faced different circumstances than Mazza and Burhop, all three men had strong incentives to disclose helpful information to the government—even if that information could reveal they had violated the law.

In sum, because a reasonable person in Littrell's situation would not have expected his statements would expose him to criminal or civil liability, those statements cannot be admitted under the exception in Rule 804(b)(3).

### B. Residual Exception

Yandell also relies on the residual hearsay exception in Rule 807. If the requirements of that rule are satisfied, then "a hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804." Fed. R. Evid. 807(a). A statement can be admitted under Rule 807 "only if the proponent gives an adverse party reasonable notice of the intent to offer the statement—including its substance and the declarant's name—so the party has a fair opportunity to meet it." Fed. R. Evid. 807(b). The court can excuse a lack of notice "for good cause." *Id.*

Yandell did not give notice of his intent to rely on the residual exception before trial. He did not affirmatively give notice during trial. He did not give any notice until the government moved in limine to exclude hearsay statements about Pinell's death. Yandell's explanation of good cause is also lacking. It is one sentence in a footnote. *See* Opp'n at 12–13 n.14 ("Such good cause exists here: the government's presentation of its case—including via recalling witnesses to play additional wiretap evidence about the Pinell homicide—heightened the importance of Mr. Littrell's confessions."). The government has long made clear that Pinell's death would be a central component of its prosecution. *See* Compl. at 33–36 (summarizing government's allegations about Pinell's death and Yandell's participation); Indictment at 9, ECF No. 25 (alleging Yandell killed Pinell "with deliberation and premeditation"); Superseding Indictment at 8 (same); *id.* at 18 (alleging Yandell murdered Pinell in aid of racketeering). Yandell could and should have given notice of his intent to rely on Rule 807 sooner.

### III. CONCLUSION

For the reasons the court provided from the bench during trial, as fully explained in this order, the court **grants** the government's motion in limine (ECF No. 2093).

IT IS SO ORDERED.

DATED: November 4, 2024.

_____
UNITED STATES DISTRICT JUDGE