UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:19-cr-00107-KJM |
| Plaintiff, | ORDER |
| v. | |
| Ronald Yandell and William Sylvester, | |
| Defendants. | |

Defendants Ronald Yandell and William Sylvester move to dismiss the superseding indictment under the Fifth and Sixth Amendments and the Jury Selection and Service Act. They argue the grand jury and trial jury in this case were drawn from a pool that was not a fair cross-section of the surrounding community. As explained in this order, the disparities they highlight are measurable and statistically significant, but they are too small to be significant as a legal matter. The motion is **denied**.

I.   BACKGROUND

A grand jury returned a superseding indictment against Yandell and Sylvester in December 2022. ECF No. 1375. The court presided over a jury trial against them and one additional defendant, Daniel Troxell, in February, March and April 2024, and the trial jury returned guilty verdicts on all counts. ECF No. 2317. This district's jury management plan

divides the district into divisions.[1]  *See* E.D. Cal. Jury Mgmt. Plan § 1.07 (Feb. 3, 2022).[2]  Both the grand jury and trial jury were selected from the Sacramento division, which includes three of the district's most populous counties: Sacramento County, San Joaquin County and Solano County.  *See id.* § 1.07(a).

Under the jury management plan, the jury administrator draws names from county voter registration lists and the records of the California Department of Motor Vehicles to create a list of potential jurors called the "master jury wheel."  *Id.* ¶¶ 2.01–2.04.  The administrator then creates from the master wheel "qualified jury wheels" of people who are "not disqualified, exempt or excused" from service under specific listed criteria, such as active military service, age, or mental infirmity.  *See id.* ¶¶ 3.01–3.05.  The administrator selects grand and trial jury panels at random from the qualified jury wheels.  *See id.* ¶¶ 4.01–4.10.

According to a report prepared by Jeffrey Martin, an expert retained by Yandell and Sylvester, slightly more than 5 percent of the qualified jury wheel identified as Black or African American, and slightly more than 16 percent identified as Hispanic or Latino.  *See* Martin Rep. ¶ 17, ECF No. 1876-1.  In comparison, Martin reports that according to the 2021 American Community Survey five-year averages, larger percentages of the population that was then eligible for jury service identified as belonging to the same categories: more than 7 percent identified as Black or African American, and more than 19 percent identified as Hispanic or Latino.  *See id.* ¶ 13.  Martin then compares these percentages using three measures, as discussed in greater detail below: absolute disparity, comparative disparity and standard deviations.  *See id.* ¶¶ 20–29.  Although the government argues comparisons between the five-year averages and the jury

---

[1] Although the jury plan refers to the Sacramento and Fresno "divisions," as that term is defined in 28 U.S.C. § 1869(e), and although this order uses that same terminology, this District is not divided into statutory divisions, as is, for example, the Central District of California.  *Compare* 28 U.S.C. § 84(b) (defining the Eastern District of California without creating divisions) *with id.* § 84(c)(1)–(3) (defining the eastern, western, and southern divisions of the Central District of California).

[2] A copy of the February 3, 2022 jury management plan—the plan in effect at the time both the grand jury and trial jury were selected—is available on the docket of this action as an exhibit to Yandell and Sylvester's revised motion at ECF No. 1876-2.

statistics are neither meaningful nor appropriate, it does not dispute the accuracy of Martin's figures or calculations themselves.

Based on Martin's analysis, Yandell and Sylvester contend the grand jury and trial jury for their case were not drawn from a fair cross section of the community because those juries underrepresented Black or African American and Hispanic or Latino citizens in violation of the Sixth Amendment, the Fifth Amendment Equal Protection Clause and the Jury Selection and Service Act, and on these grounds they move to dismiss the superseding indictment. *See generally* Revised Mot. Dismiss, ECF No. 1876. The government opposes the motion and argues Yandell and Sylvester have not shown their juries were under-representative in any way that deprived them of constitutional or statutory rights. *See generally* Opp'n, ECF No. 2393. Yandell and Sylvester have filed a reply brief, ECF No. 2410, and the court held a hearing on August 21, 2024, Mins., ECF No. 2429. Jason Hitt, Ross Pearson and David Spencer appeared for the United States. Steven Kalar and Sean McClelland appeared for Yandell. Ashley Vasquez appeared for Sylvester.

## II. SIXTH AMENDMENT AND JURY SERVICE ACT

"The Sixth Amendment and the Jury Selection and Service Act of 1968 . . . afford criminal defendants 'the right to be tried by an impartial jury drawn from sources reflecting a fair cross section of the community.'" *United States v. Hernandez-Estrada*, 749 F.3d 1154, 1157 (9th Cir. 2014) (en banc) (quoting *Berghuis v. Smith*, 559 U.S. 314, 319 (2010)). To show a jury was not a fair cross section in violation of both the Constitution and the Jury Selection Act, a defendant must show (1) that an underrepresented or excluded group "is a 'distinctive' group in the community," (2) that the group's representation in jury venires "is not fair and reasonable in relation to the number of such persons in the community," and (3) "that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *United States v. Miller*, 771 F.2d 1219, 1228 (9th Cir. 1985) (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)); *see also Hernandez-Estrada*, 749 F.3d at 1158 (noting "same analysis" applies to both Jury Selection Act and Sixth Amendment). If a defendant makes this prima facie showing, then the burden shifts to the government to show the "aspects of the jury-selection process that result in the

disproportionate exclusion" advance a "significant" government interest both "manifestly and primarily." *Hernandez-Estrada*, 749 F.3d at 1159 (alterations omitted) (quoting *United States v. Rodriguez–Lara*, 421 F.3d 932, 940 (9th Cir. 2005)).

It is settled law that "African Americans and Hispanics are distinctive groups in the community" under the first part of the three-part test above, leaving only the second and third parts of the test unresolved in this case. *Id.* Starting, then, with the second part, Yandell and Sylvester must offer "proof, typically statistical data, that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community." *Id.* (quoting *United States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996)).

"[I]n analyzing the distinctive group's representation in the district or region as a whole, a court 'must rely on the statistical data that best approximates the percentage of jury-eligible [members of the distinctive group in question] in the district.'" *Id.* at 1161 (alterations in original) (quoting *United States v. Torres–Hernandez*, 447 F.3d 699, 704 (9th Cir. 2006)). The government argues Martin has wrongly relied on data that was not available to the Clerk's Office and Jury Administrator. *See* Opp'n at 5–6. The court assumes without deciding that Martin relied on appropriate data; as explained below, those data do not support defendants' motion.

Courts have employed several methods to decide whether a jury panel represents a fair cross-section of the community. *Hernandez-Estrada*, 749 F.3d at 1160. The first is a simple test known as the absolute disparity test. It "examines 'the difference between the percentage of the distinctive group in the community and the percentage of that group in the jury pool.'" *Id.* (quoting *Rodriguez–Lara*, 421 F.3d at 943). In this case, there is an absolute disparity of about 2 percent (7% minus 5%) among those who identify as Black or African American and 3 percent (19% minus 16%) among those who identify as Hispanic or Latino. *See* Martin Decl. ¶¶ 21–22.

The absolute disparity test has its advantages and disadvantages. Its greatest advantage is likely its simplicity. It is easy to calculate and easy to understand what it measures. Courts have used the absolute disparity test in many past cases. And because courts have used the test for so long, it is simpler to understand how one case compares to the others that have gone before. *See Hernandez-Estrada*, 749 F.3d. at 1162.

The primary disadvantage of the absolute disparity test is that it "'can be misleading' when the distinctive group in question makes up only a small percentage of the population." *Id.* (quoting *Berghuis v. Smith*, 559 U.S. 314, 329 (2010)).

> For example, if we assume a group makes up 90% of the population, but 80% of the jury pool, there would be a 10% absolute disparity. Under those circumstances, it is doubtful that any court would consider the group underrepresented. However, if a population group constituted 10% of the population, but had no representation in a jury pool, that result might give rise to fair cross-section concerns. Yet, the absolute disparity—10%—would be identical under both scenarios.

*Id*. Nor does the absolute disparity test have a theoretical foundation in statistics. *See id.* at 1162.

The absolute disparities in this case are relatively small (2% and 3%) but nontrivial given the relatively smaller proportions of the larger population that identify as Black or African American and Hispanic or Latino (7% and 19%, respectively). *See* Martin Decl. ¶¶ 21–22 (reporting calculations). In the past, federal courts have held that similar differences do not show defendants were deprived of their rights under the Sixth Amendment or the Jury Selection Act. *See, e.g.*, *United States v. Sanchez-Lopez*, 879 F.2d 541, 548 (9th Cir. 1989); *United States v. Kleifgen*, 557 F.2d 1293, 1297 (9th Cir. 1977). In this case, however, the court is not prepared to make a decision on the basis of absolute disparities alone.

Another option is the comparative disparity test. "Comparative disparity is calculated 'by taking the absolute disparity percentage and dividing it by the percentage of the distinctive group in the total population.'" *Hernandez-Estrada*, 749 F.3d at 1162–63 (quoting *Rodriguez–Lara*, 421 F.3d at 943 n.10). For a group that made up 90 percent of the population but 81 percent of the jury pool, the absolute disparity would be 9 percent (90 minus 81) and the comparative disparity would be 10 percent (9 divided by 90). By contrast, a group that made up 10 percent of the population and 1 percent of the jury pool, the absolute disparity would be the same, 9 percent (10 minus 1), but the comparative disparity would be 90 percent (9 divided by 10). *See* Martin Decl. ¶ 23 (explaining calculation). The comparative disparity is thus larger for groups that make up a smaller proportion of the population, so it "illustrates, in a general way, the comparative

5

differences in a manner that takes population size into consideration." *Hernandez-Estrada*, 749 F.3d at 1163. But the comparative test has disadvantages, too. Like the absolute disparity test, it has no sound statistical basis. *Id.* at 1163. The comparative test can also overstate disparities for groups that make up very small portions of the population. *See id.* at 1162–63.

In this case, the comparative disparity test shows an approximate 29 percent difference between the proportion of Black or African American jurors in the qualified jury wheel and the population at large (2.0% divided by 7.1%). *See* Martin Decl. ¶ 25. The result for those identifying as Hispanic or Latino is approximately 17 percent (3.4% divided by 19.4%). *See id.* ¶ 26. As the government points out in its opposition, comparative disparity rates in these ranges do not necessarily show whether a jury was drawn from a fair cross-section of the community. *See* Opp'n at 9 (quoting *United States v. Smith*, 437 F. Supp. 3d 734, 742–43 (D. Alaska 2020), in turn collecting authority from the Third, Ninth, and Tenth Circuits).

In light of the limits of the absolute and comparative tests, courts also have looked to conventional statistical tools, such as the standard deviation, which can give some insight into how likely it is that a particular jury pool was chosen at random and without preference from the larger population. *See Hernandez–Estrada*, 749 F.3d at 1163–64 (collecting and explaining examples). The standard deviation is a commonly used "measure of the predicted fluctuations from the expected value." *Id.* at 1163 (quoting *Castaneda v. Partida*, 430 U.S. 482, 496 n.17 (1977)). It "has the advantage of being firmly grounded in statistical theory, and generally applicable to both large and small population groups." *Id.* But like the absolute and comparative disparity tests, it relies on the fundamental and perhaps incorrect assumption that it is appropriate to precisely compare a qualified jury wheel with the larger population. "By definition, the qualified wheel is not the product of random selection; it entails reasoned disqualifications based on numerous factors." *United States v. Rioux*, 97 F.3d 648, 655 (2d Cir. 1996); *see also Hernandez-Estrada*, 749 F.3d at 1164 (acknowledging this criticism). Relying too heavily on statistical comparisons can obscure the reality that the qualified jury wheel is not itself the jury: "[t]he probability that the composition of a jury wheel arose by random selection from the community is not directly related to the defendant's chances of drawing a jury of a certain

1 composition." *Hernandez-Estrada*, 749 F.3d at 1163 (alterations in original) (quoting Peter A. Detre, *A Proposal for Measuring Underrepresentation in the Composition of the Jury Wheel*, 103 Yale L.J. 1913, 1928 (1994)).

According to Martin's calculations, the proportions of people in the qualified jury wheel who identify as Black or African American differs from the proportion in the five-year average population figures by more than seven standard deviations. *See* Martin Decl. ¶ 28. The same is true of the proportion who identified as Hispanic or Latino. *See id.* ¶ 29. This suggests the differences are unlikely attributable to random chance. *See id.* ¶ 27.

The Ninth Circuit does not "confine district courts to a particular analytical method." *Id.* at 1164–65. District courts may use any one or more of the methods highlighted above, in addition to others, "to respond to the evidence presented." *Id.* "[T]he appropriate test or tests to employ will largely depend on the particular circumstances of each case." *Id.*

In this case, the court has considered all three methods highlighted above: the absolute disparity test, the comparative disparity test and the analysis of standard deviations in Martin's declaration. Together, these methods show a measurable difference between the number of people who identified as Black, African American, Hispanic or Latino in the larger population and in the qualified jury wheel. That difference, however, is small in practical terms. In the qualified jury wheel, about 5 percent identified as Black or African American compared to 7 percent or so within the larger population, a comparative reduction of about 29 percent. In the qualified jury wheel, about 16 percent identified as Hispanic or Latino, whereas about 19 percent or so of the larger population did the same, a comparative reduction of about 17 percent. *See* Martin Decl. ¶¶ 21–22, 25–26. Martin's analysis of the standard deviations shows those differences were probably not the product of pure chance, but they remain small nonetheless. *Sanchez-Lopez*, 879 F.2d at 548; *Kleifgen*, 557 F.2d at 1297; *Smith*, 457 F. Supp. 3d at 742–43; *see also* Opp'n at 8 (collecting authority).

As the Circuit made clear in *Hernandez-Estrada*, "the challenging party must establish not only *statistical* significance, but also *legal* significance. The results of any statistical method must be examined in the context of the likely, actual, 'real life' impact on the jury pool at issue."

749 F.3d at 1164 (emphases in original) (quoting *Kleifgen*, 557 F.2d at 1297). "In other words, if a statistical analysis shows underrepresentation, but the underrepresentation does not substantially affect the representation of the group in the actual jury pool, then the underrepresentation does not have legal significance in the fair cross-section context." *Id.* In this case, for example, as among a group of 18—12 trial jurors and 6 alternates—a difference of two or three percentage points is proportionally smaller than a one-person effect.[3] The parties have identified no case in which comparably small differences supported a defendant's motion, and the court is aware of none. Courts have in fact found larger disparities are not legally meaningful, including in recent years. *See Howell v. Superintendent Rockview SCI*, 939 F.3d 260, 268 (3d Cir. 2019) (reaching this conclusion and collecting earlier authority); *Smith*, 457 F. Supp. 3d at 741 (same).

This is not to say these disparities are meaningless or no cause for concern. If Martin is correct in his opinion that the disparities he calculated are attributable to a systematic cause—a question this court need not and does not reach—then that cause should be corrected. *See, e.g.*, *Hernandez-Estrada*, 749 F.3d at 1158 & n.1 (recounting district court's acknowledgement that "improvements could be made" and later changes for jury selection procedures within Southern District of California). But those disparities do not support a prima facie case under the Sixth Amendment or the Jury Selection Act.

## III.   FIFTH AMENDMENT

Yandell and Sylvester also argue they are entitled to relief under the Fifth Amendment's Equal Protection Clause. *See* Mot. at 12. As they recognize, this court is bound by contrary Ninth Circuit precedent. *See id.* (citing *United States v. Esquivel*, 88 F.3d 722, 725 (9th Cir. 1996)).

/////

---

[3] Two percent of 18 is 0.36, and 3 percent of 18 is 0.54. The figures are similarly small for a grand jury, which "must have 16 to 23 members." Fed. R. Crim. P. 6(a)(1). Two percent of 23 is 0.46, and 3 percent of 23 is 0.69.

**IV.      CONCLUSION**

The court **denies** the defendants' revised motion to dismiss the indictment based on the composition of the grand and petit juries (ECF No. 1876).

IT IS SO ORDERED.

DATED: November 5, 2024.

_____
SENIOR UNITED STATES DISTRICT JUDGE